J-S22031-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.W., A MINOR | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.E., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 316 WDA 2024 |

Appeal from the Order Entered February 23, 2024
In the Court of Common Pleas of Allegheny County
Orphans Court at CP-02-AP-0000170-2023

BEFORE:  PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: July 17, 2024**

M.E. (Mother) appeals from the order granting the termination of parental rights (TPR) petition filed by the Allegheny County Office of Children, Youth & Families (CYF), which terminated Mother's parental rights to her teenage son, R.W. (Child).[1]  We affirm.

## CASE HISTORY

Child was born in July 2006.[2]  He most recently came into CYF's care in November 2022.  **See** Petition for Involuntary TPR (Petition), 7/12/23, at 3.

---

[1] The orphans' court also terminated the parental rights of Child's father, R.L.W. (Father).  It appears from the record that Father has not appealed.

[2] Although Child is now 18 years old, this appeal is properly before us.  "It is axiomatic that a TPR has 'significant and permanent consequences for both the parent and child.'"  **In re Adoption of M.E.L.**, 298 A.3d 118, 131 (Pa. 2023) (Wecht, J., concurring in part and dissenting in part) (footnote omitted).  **See id.** (emphasizing the finality of an order terminating parental rights).

Child was adjudicated dependent in 2010, 2016, and 2019, and "has a lengthy history of out of home placements." *Id.* at 3 n.1. He was adjudicated dependent a fourth time in December 2022. *Id.* The orphans' court explained:

In November of 2022, [Child] was removed from [M]other's care pursuant to an emergency custody authorization. At that time, Mother reported that she was homeless. [Child] was temporarily placed with [K.E., (Maternal Aunt)], but moved to another foster home at the end of that month. It appears that there were issues with that foster placement[,] as [Child] absconded from the home and his whereabouts were unknown for three days. He did eventually return to the foster home. [Child] was adjudicated dependent for the fourth time on December 13th, 2022. Mother was court[-]ordered to undergo a drug and alcohol evaluation and mental health evaluation and to follow any recommendations. She was also ordered to work with in-home services and obtain housing. [C]hild was placed in the care of [M]aternal [A]unt … in early 2023.

The parties appeared on February 1st, 2023, for a permanency review hearing. Mother was found to be in minimal compliance and to have made minimal progress. The court order reflected that these determinations were made based on reports that Mother was homeless, not addressing her drug and alcohol or mental health concerns[,] and had not been meeting [C]hild's educational and medical needs. [Child] was permitted to remain in the care of [Maternal Aunt] and Mother's goals remained the same as in previous orders.

The parties appeared for a permanency review hearing on May 18th, 2023. The court ordered [C]hild to remain in the care of [Maternal Aunt]. Mother was found to be minimally compliant and to have made minimal progress. It was reported that Mother obtained housing … but still had not completed a drug and alcohol or mental health evaluation. Mother's goals remained the same as in previous orders. []CYF filed the petition to terminate Mother's parental rights on July 12, 2023.

The parties appeared for a permanency review hearing on August 10th, 2023. [C]hild was permitted to remain in placement with

[Maternal Aunt]. Mother was found to be minimally compliant and to have made minimal progress. It was reported that Mother had undergone a drug and alcohol evaluation but refused to release the results to []CYF. It was further reported that Mother had still not undergone a mental health evaluation. Mother's goals remained the same as in previous orders.

Orphans' Court Opinion (OCO), 4/15/24, at 6-7.

The orphans' court held a termination hearing on January 30, 2024. CYF presented testimony from case manager, Melissa Dunbar-Kraus; and psychologist, Eric Bernstein. Mother presented testimony from her boyfriend, DeAngelo Grant; Child's former assistant principal, Robert Powell; and family advocate, Demitra Giddeon. Mother also testified in opposition to termination.

Ms. Dunbar-Krause stated that she was the family's case manager "since 2018, and [the] active caseworker since February of 2023." N.T., 1/30/24, at 4-5. Ms. Dunbar-Krause recounted CYF's involvement, and explained that Mother "has five other children in addition to [Child]." *Id.* at 6-7. One of the children, an "11-year-old son … is in the permanent legal custody" of Maternal Aunt. *Id.* Ms. Dunbar-Krause testified that Mother has a history of unstable housing, substance abuse, and mental health issues. *Id.* at 8. Most recently, Mother's goals were "to obtain housing, complete an updated drug and alcohol assessment, [complete a] mental health assessment, comply with any recommendations, and work with in-home services." *Id.* at 10. Ms. Dunbar-Krause stated that Mother's "goals [had] remained essentially the same," with "additional goal[s] … added[, at the August 2023 hearing,] regarding domestic violence counseling [and] random urine screens." *Id.* at 11.

According to Ms. Dunbar-Krause, Mother and Child last saw one another in April 2023. *Id.* at 15. She stated that the court had ordered visitation "at [Child's] discretion," and Child "has indicated that he does not wish to visit [Mother]." *Id.* 15, 28. Ms. Dunbar-Krause testified that Child had been out of Mother's care "for 14 months, since November 7th of 2022," and "continue[s] to be without essential care, control and subsistence" from Mother. *Id.* at 18.

Ms. Dunbar-Krause explained that Child was originally placed with Maternal Aunt from November 2022 to January 9, 2023, and was returned to Maternal Aunt's care on January 23, 2023. *Id.* at 27. Ms. Dunbar-Krause responded to questions from CYF's counsel as follows:

Q.    [W]hat have you observed [with Child's placement]?

A.    I have observed [Child] to be very comfortable in the care of [M]aternal [A]unt, [where he] has all of his basic needs met, and appeared to be nurtured and care[d] for in that home.

Q.    Have you seen signs of affection between [Child] and [Maternal A]unt?

A.    Yes.

Q.    And what about between [Child] and his foster siblings?

A.    Yes, he is very close with his cousins.

Q.    And who meets the day-to-day needs of [Child]?

A.    His maternal aunt, [K.E.].

Q.    Does [Child] have any special needs?

A.    He does not. He has a past diagnosis of ADHD, though he has declined to have medication at this point for that. He is

> receiving drug and alcohol treatment currently in his program.[3]
>
> Q.     Who ensures that he makes it to any appointments necessary?
>
> A.     While he is in the care of [M]aternal [A]unt she makes sure that that happens.  Currently he is in a placement and they are ensuring that that is occurring.  Maternal [A]unt has signed for all of those things to occur during his placement.
>
> Q.     Okay.  Does CYF believe that termination of [M]other's parental rights would serve [Child's] needs and welfare?
>
> A.     We do.
>
> Q.     And why?
>
> A.     [Child] has been out of the care of [Mother] for the past 14 months and for much of his life prior to that has had active CYF involvement.  [CYF] believes [Child] deserves to have a permanent and loving home, and that is the desire he has expressed as well.

*Id.* at 19-20.  Ms. Dunbar-Krause opined that Child had been in placement "19 months out of the last 24," and "continues to desire to be adopted." *Id.* at 29.

Dr. Bernstein testified as an expert in child psychology.  *Id.* at 32-33. Dr. Bernstein evaluated Mother and Child individually, and Child and Maternal Aunt together.  *Id.* at 31-32.  Dr. Bernstein was aware that Child and Mother had not communicated since April 2023.  *Id.* at 43.

According to Dr. Bernstein, Mother did "not fully" cooperate with the evaluation, and withheld information about her medications and "the extent

_____

[3] Ms. Dunbar-Krause explained that Child was receiving in-patient drug and alcohol treatment at "Abraxas 1," but "had [Maternal Aunt's] permanent home to return to." *Id.* at 25, 27.

of any victimization in her adulthood and the resulting injuries she incurred."

*Id.* at 33 (admitting Dr. Bernstein's report as Exhibit D). He added that

Mother "openly complied … in the evaluation and answering questions[,] as

long as [the questions] didn't relate to her education, medication, and violence

history." *Id.* at 43-44.

Dr. Bernstein noted that Child had been involved in a "delinquency

matter," and Child's "six[-]month stay" in Abraxas "would bring him closer to

the age of ma[jo]rity." *Id.* at 38-41. He testified:

> I should emphasize that at the time of the evaluation[, Child] was 17 years old, so insofar as [court-ordered evaluations usually involve] younger children, there was no playful engagement. This was more of a discussion.
>
> Essentially [Maternal Aunt] spoke about [Child's] adjustment in her care, provided some perspective about their relationship, her involvement in his life, and opined about [Child's] fit in her home as compared to, for example, reunifying with [M]other.
>
> Overall [Child] showed respect toward [Maternal Aunt] and expressed feeling comfortable in her care. To the extent that was observed is harder of course to measure when working with older children, but there is nothing about what I observed that suggested they were uncomfortable with each other.
>
> ***
>
> [Maternal Aunt] has been consistently involved in [Child's] development, … especially for the past six years per [Maternal Aunt], and [Child] conveyed he felt comfortable and desired to remain in her care for the [con]ceivable future.
>
> ***
>
> [Child] refused [to attend an interactional evaluation with Mother]. … [H]e did not show. I think in the interview when I met with him[,] he expressed his disinclination to have contact with [M]other…. He spoke indirectly. For example, [Child

indicated] that [Maternal A]unt[,] in comparison to [M]other[,] is more supportive. He inflated her overall parenting with a letter grade of an A, compared to [M]other, [who] he graded with a C or D in overall performance in raising him[,] and highlighted that [Maternal A]unt and [M]other had a high conflict relationship. To what extent all of that or any of that explains the reasons for his lack of attendance [at the evaluation with Mother] is unknown, but certainly it seems [Child] has made his position clear that he does not want to be with [Mother]. Without seeing him with [Mother], however, it's hard for me to give an opinion about their relationship.

***

There was some attempt by [Maternal Aunt] to protect [Child]. … I don't believe she made any mention about his marijuana use, which to a degree raised questions as to the reasons for why[,] juxtaposed to what [M]other shared about [Child's] obtaining marijuana from his family. That raised concerns.

[Child] reported that he has never received marijuana from [Maternal A]unt, nor smoked … with [Maternal A]unt, but the allegations remain present nonetheless by [M]other.

[A]s a permanency resource, I can say with some measure of confidence that [Maternal A]unt and [Child] share an important bond that is long-term in nature. [Maternal A]unt recognizes [Child's] needs and expressed willingness to meet those needs. [Child] is almost an adult and presumably has some sense of what's important to him and the ability of his aunt to support him. In that sense I did not gain any information to suggest [Maternal A]unt is incapable of serving as a permanency resource. Obviously [M]other opposes [Maternal A]unt fulfilling that role and seeks reunification as well.

*Id.* at 35-38.

Child's counsel asked Dr. Bernstein, "What did you find with respect to the bond between Mother and [Child]?" *Id.* at 44-45. He answered:

Well, at this point[,] … [Child] is refusing contact with [M]other, and now as per the reports of today[,] he is in a placement which further limits their opportunity to have interaction.

- 7 -

According to at least []CYF, there is a history of alleged neglect of [Child's] needs by [M]other. So with all of that…, I concluded that the bond is insecure, meaning essentially that it is tenuous and compromised, and with the absence of contact and communication it can be categorized as unhealthy or unsupportive.

*Id.* at 45.

On cross-examination by Mother's counsel, Dr. Bernstein clarified:

[My] conclusions are based upon collateral [information] and interviews with [M]other, [Maternal A]unt, and [Child], but not [on evaluating Child] and [M]other [together]. That is the one aspect about which I'm not able to glean information as to their actual communication with one another.

If we're talking about, let's say, a three-year-old, I would be much more hesitant to give an opinion[,] … but as this is a 17-year-old, there are some things that I'm able to gather from the history and the reports of individuals, including an almost 18-year-old[, which] helps [me] understand and measure, even indirectly, frankly, the bond between [C]hild and [M]other.

*Id.* at 46.

Next, Mother presented testimony from DeAngelo Grant. Mr. Grant had known the family for two years and nine months, "through a relationship" with Mother. *Id.* at 48. He relayed that he was present during Mother's phone calls with Child, most recently in November 2023, and saw Mother and Child together during Easter 2023. *Id.* at 49, 51. Mr. Grant stated:

The interaction from my vantage point was similar to any teenage boy, having been one myself, with their mother. It's at times[,] all things considered [w]hat th[e] family has gone through, there have been sometimes where [Mother] is basically providing money, food, guidance, or advice to [C]hild in hopes of getting him to do the right thing and go[] to school. It's always some kind of lesson or something she's trying to tell [C]hild while trying to get her household together.

That's something I also witnessed, from her having nothing to moving herself to something and trying to get her kids back. So, yes, there has been a parent-child relationship. [Mother] always maintains a parental demeanor with her children….

*Id.* at 49.

Mr. Grant further testified:

I have physically been there when [Mother] has given [Child] instructions on what she expects from him both academically during school time and after hours as well.

＊＊＊

[Child's] response a lot of times has been, okay, mom, okay, I hear you, I got it, I got it, I'm not going to do anything that you don't want me to do. Typical teenage behavior, nothing uncharacteristic about how he responds to modern day rules and parenting.

*Id.* at 50.

Mother also presented testimony from high school principal Robert Powell, who knew Mother and Child when he was the assistant principal at Child's school "in 2015, 2016, and 2017." *Id.* at 57. Although several years had passed, Mr. Powell stated he had "a pretty good memory of the families that I worked closely with. And because I worked closely with [Mother] and her three children, I have a pretty good memory of our experience together." *Id.* at 60. He testified he "was [Mother's] person when she needed to address matters at the school." *Id.* Mr. Powell stated:

In terms of [Child's] schooling, [Mother] was very involved. She attended Celebration of Learnings, which is an opportunity for us to display what kids are learning in their arts and academic classes. As well too[,] any time we needed to call her in terms of disciplinary action or any support, she would be present for that.

- 9 -

*Id.* at 58. Mr. Powell recalled Mother attending conferences and meetings "roughly between five to ten [times] a year." *Id.* at 59. He described Mother as an advocate for Child's education, and stated, "In those days[, Child] had good attendance." *Id.*

Mother's third witness, Demitra Giddeon, testified to being Mother's advocate. *Id.* at 63. In February 2023, Ms. Giddeon began working with Mother at the Abolitionist Law Center; in August 2023, she began working with Mother at Pittsburgh Family Liberation. *Id.* at 65. Ms. Giddeon described the former organization as helping "individuals who are dealing with the criminal legal system … as they deal with their cases and advocate for themselves and each other." *Id.* at 64. She described Pittsburgh Family Liberation as "a mutual aid organization for families who are dealing with CYF cases." *Id.* Ms. Giddeon stated that the organization, "help[s] … do the things that services are purported to do but don't do. For instance, in-home navigators who are supposed to help find housing but don't." *Id.*

Ms. Giddeon testified that Mother "referred herself" for assistance. *Id.* at 70. She explained that Mother "was having difficulty scheduling a mental health evaluation as part of her requirement for her CYF case." *Id.* at 65. According to Ms. Giddeon, Mother obtained the mental health evaluation after "going around in circles" with CYF and various providers. *Id.* at 66. Ms. Giddeon opined that her organization "help[ed Mother] think through how to deal with the [CYF] system, because a lot of times when you have worked with systems for a long time, you get really defensive." *Id.* at 67.

- 10 -

Mother was the final witness. Regarding her court-ordered goals, Mother testified that she obtained a drug and alcohol evaluation in June 2023. *Id.* at 72. When Mother's counsel asked why it "took so long," Mother replied: "To be honest, I don't recall." *Id.* at 72-73. Mother further testified to obtaining her mental health evaluation from Dr. Bernstein. *Id.* at 73. She then stated:

> The only hiccup is housing. As we all know, the housing crisis has been really horrible, so I don't feel that I should have to be punished for not having housing for my children. [Child] has a couple months to go before he's 18, and that's when my real problems are going to sink in because he's not a baby anymore. You know, you can't come through the juvenile system. And I have just been trying to save [Child] from himself. [Child] doesn't know what he needs, he just knows what he wants. He wants freedom, he wants to smoke weed, he wants to sneak girls in. I give him stability, a life. [Child] has a better chance with me.

*Id.* at 77-78.

When Mother's counsel asked about obtaining an Intimate Partner Violence (IPV) evaluation, Mother testified that she "saw somebody previously," and had "just" spoken to someone a few days prior. *Id.* at 74. Mother stated she was not seeking IPV treatment because it was not recommended and she did "not need it." *Id.* Mother also testified that she never participated in random urine screening because she "never had a drug use problem." *Id.* at 80-81.

As to Child, Mother stated that he "has had his issues." *Id.* at 80. She testified that she was trying to stay involved in Child's schooling and services at Abraxas. *Id.* at 75. She opined that "everybody wants to give [Child] what

he wants, but he needs education, he needs a support like me, and that is what he doesn't like, because he wants freedom over me trying to save his life and see him be somebody in life." *Id.* at 76. Mother claimed Child "calls me when he wants something, [such as] money [or] food, which I provide. I have always provided that for [Child]." *Id.* Mother stated that Child "is a very smart, intelligent, young man, but we need to be the ones to come together and not let [Child] get destroyed." *Id.* at 77.

After Mother's testimony, counsel for CYF and Child advocated for termination, while Mother's counsel argued in opposition to termination. *Id.* at 82-84. The orphans' court did not issue a decision on the record. On February 23, 2024, the trial court entered an order terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (b). Mother timely filed a notice of appeal and concise statement of errors pursuant to Pa.R.A.P. 1925. The trial court issued an opinion on April 15, 2024.

## ISSUES

Mother presents the following issues for review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. §2511(a), (2) and (5)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. §2511(b)?

Mother's Brief at 6.

**DISCUSSION**

A petitioner must prove by clear and convincing evidence that the asserted grounds for termination are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). The orphans' court is free to believe all, part, or none of the evidence, make all credibility determinations, and resolve conflicts in the evidence. ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004). We have explained:

> Where the [orphans'] court's factual findings are supported by the evidence, an appellate court may not disturb the [orphans'] court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and quotation marks omitted). "[U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents." ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which provides for a bifurcated analysis. First, the court must

consider the parent's conduct and the enumerated grounds set forth in 23 Pa.C.S. § 2511(a). **Id.** at 830. If the court finds grounds for termination under Section 2511(a), it must assess evidence of the child's needs and welfare under Section 2511(b), "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013). This Court "need only agree with [the] decision as to any one subsection of [Section 2511(a), in addition to Section 2511(b),] to affirm the termination of parental rights." **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

1. Section 2511(a) Grounds for Termination

In her first issue, Mother challenges the orphans' court's findings as to Section 2511(a)(2), which provides for termination of parental rights when:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2). The petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." **In re A.H.**, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination "are not

- 14 -

limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." ***Id.***

Mother argues CYF presented insufficient evidence for termination under Section 2511(a)(2) because she remedied the conditions which led to Child's removal. Mother's Brief at 19. Mother claims she obtained stable housing; "fulfilled her goal of obtaining a substance abuse evaluation … on June 27, 2023"; "took a drug screen" which "did not indicate use of any illicit substance"; and "address[ed] her mental health goal" by "participat[ing] in a mental health evaluation with Dr. Bernstein on November 16, 2023." ***Id.*** at 19-20. Mother asserts she "is in a much better place" and "is able to provide for [Child]." ***Id.*** at 20. Thus, she contends the orphans' court abused its discretion in terminating her parental rights under Section 2511(a)(2). ***Id.***

To the contrary, the orphans' court concluded that "Mother's inconsistency in addressing her goals has prevented her from making diligent efforts toward the reasonable prompt assumption of parental duties." OCO at 11. Noting that a child's life "'cannot be held in abeyance while a parent attempts to … assume parenting responsibilities,'" the court observed that Mother "picks and chooses which goals she wishes to comply with despite knowing that she must accomplish certain goals before [C]hild can be returned to her care." ***Id.*** (citing ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006)). The orphans' court explained:

> Mother's court-ordered goals have remained the same…. She was ordered to obtain and maintain appropriate housing, address concerns about her drug and alcohol use, address her mental

health issues, work with in-home services, and ensure that [Child's] educational and medical needs were being met.

\*\*\*

Mother's chronic homelessness has caused [Child] to be removed from her care several times. As such, obtaining and maintaining housing was an important goal for Mother. … It took Mother approximately seven months to secure housing. While Mother should be commended for obtaining this housing, it remains to be seen whether she can actually maintain it long term.

\*\*\*

Mother has not been transparent about her drug and alcohol use and did not complete an evaluation until June of 2023. For an unknown reason, Mother refused to share the results of this evaluation with []CYF for several months. She has refused to submit to drug screens through []CYF. Additionally, Mother completed the evaluation through the POWER Program. She was not recommended for any treatment after this evaluation[,] but the court notes that POWER's evaluations are based on self-reporting. As such, the court lacks enough information to determine whether Mother provided an accurate account of her drug and alcohol history.

Since the family first became court active, Mother's mental health has been a concern. It has been court-ordered for her to undergo a mental health evaluation and follow all recommendations in nearly every court order since 2019. This is not a new goal for Mother and her nonchalance about the subject during the termination proceedings was concerning. The court found that Mother lacked credibility during her testimony regarding her lack of compliance with this goal. Additionally, Mother was largely uncooperative during her evaluation with Dr. Bernstein. This caused the doctor to be unable to render any sort of diagnosis. So, while Mother physically attended the evaluation, she did not meaningfully submit to testing and declined to address many of the questions asked of her. The testimony was unclear about Mother's compliance with in-home services. It appears she did work with them for a period of time when the case opened. Since [Child] was adjudicated in 2022, Mother has been minimally involved in his educational and medical decision-making. [Maternal Aunt] was granted educational and medical decision-making rights on multiple occasions. While Mother complied with

- 16 -

some of her goals, she has not made any meaningful progress in addressing the issues which have caused [Child] to come into foster care.

OCO at 10-11 (citation omitted).

The evidence supports the court's reasoning. For example, the CYF caseworker, Ms. Dunbar-Krause, testified that Child had been out of Mother's care "for 14 months, since November 7th of 2022," and "continue[s] to be without essential care, control and subsistence" from Mother. N.T., 1/30/24, at 8. Thus, the court did not err or abuse its discretion in finding Mother's repeated and continued incapacity to parent has caused Child to be without essential care, and the conditions and causes of Mother's parenting incapacity cannot or will not be remedied.

## 2. Section 2511(b) Needs and Welfare

In her second issue, Mother asserts the orphans' court erroneously found that termination serves Child's needs and welfare. Mother's Brief at 22-24. Mother attempts to support her argument by referencing Dr. Bernstein's testimony about Child's marijuana use and placement at Abraxas. *See id.* at 23-24. Mother claims "[i]t does not serve [Child's] needs and welfare to terminate Mother's parental rights when [Child] is not even residing in his foster home." *Id.* at 24. She also contends:

Mother loves [Child] and has much to offer for his benefit. The relationship between Mother and [Child] adds value to their lives. Termination would unnecessarily and permanently deprive [Child] of his relationship with Mother, and it is not best for his needs and welfare. [Child] deserves to have his relationship with Mother preserved, which can only be assured if Mother retains her parental rights. It does not serve [Child]'s needs and welfare to

- 17 -

terminate Mother's parental rights when he is not even residing in his foster home. Therefore, the decision of the [orphans'] court that termination of Mother's parental rights best serves the needs and welfare of [C]hild should be reversed.

*Id.* at 23-24.

Although Mother cites general case law, she fails to cite or discuss prevailing precedent. Notably, after finding grounds for termination under Section 2511(a), the orphans' court was required to "give primary consideration" to Child's "developmental, physical and emotional needs." 23 Pa.C.S. § 2511(b). The Pennsylvania Supreme Court has often stated that courts "should consider the matter from the child's perspective, placing h[is] developmental, physical, and emotional needs and welfare above concerns for the parent." *See In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citation omitted). Moreover, "determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis." *Id.* "Thus, the court must determine each child's specific needs." *Id.* at 1106.

While not an exhaustive list, a court determining whether to grant or deny termination is required to consider: (1) whether the child is in a pre-adoptive home; (2) whether the child has a bond with the foster parent/family; (3) whether the child has a bond with the biological parent who is the subject of the termination proceeding; and (4) whether termination of the biological parent-child bond, if any, would destroy an existing necessary and beneficial relationship. *Id.* at 1113. Courts "must not only consider the

child's bond with the biological parent, but also 'examine the intangibles such as the love, comfort, security, and stability the child might have with the **foster** parent.'" *Id.* at 1111 (emphasis in original, citation omitted).

Here, the orphans' court cited *K.T.* "in its best interest analysis." OCO at 11. In particular,

> [t]he court considered the nature of the bond between Mother and [Child], his respective safety needs[, and] his relationship with his foster mother[, Maternal Aunt]. The relationship between Mother and [Child] is strained and he has refused to have contact with her for some time. Throughout the life of the case, there has always been conflict between [C]hild and Mother. Time and time again, Mother's instability has caused the family to become court active. The one and constant support for [Child] has been his current caregiver and [M]aternal [A]unt…. Despite significant challenges with [Child's] behavior, she has always been a placement resource for him. In his individual evaluation with Dr. Bernstein, [Child] reported that he relied on [Maternal Aunt] to meet his daily needs[,] and that she was much more supportive than [M]other. It was Dr. Bernstein's ultimate opinion that the bond between [Maternal Aunt] and [Child] was healthy and secure in nature. [Child's] refusal to have contact with Mother[,] along with his explicit desire that Mother's parental rights be terminated[,] leads the court to agree with Dr. Bernstein's opinion that the bond between the two is insecure and unhealthy.
>
> [Child's] stability and safety have always been of great concern to this court. Mother has a history of homelessness and has shuffled from state to state with her children. … Mother has been unable to provide a stable environment for [Child] for an extended period of time. Despite Mother's concerns about the safety of [Maternal Aunt's] home, she has often resorted to staying in that home with her children and to leaving her children in [Maternal Aunt's] care. The court does have concerns that [Child] was using marijuana in [Maternal Aunt's] home. However, there has been no evidence other than Mother's opinion that [Child] is unsafe in the home or using drugs with [Maternal Aunt].
>
> Historically, Mother has only been able to maintain a safe and stable environment for [Child] for a few months before losing her

housing or moving. Additionally, Mother has refused to meaningfully engage in a mental health evaluation[,] which also raises safety concerns if [Child] were to be placed back in her care. Mother's chaotic lifestyle has caused her to lose custody of all of her children. [Child] no longer wishes to have a relationship with her. It is unimaginable to this court that a seventeen-and-a-half year old child would be adjudicated dependent four separate times and be active in the juvenile court for such a significant period of time. Time and time again, Mother has proven herself to be incapable of meeting [Child's] developmental, physical[,] and emotional needs and welfare.

*Id.* at 12-13 (citations to record omitted).

Again, the evidence supports the orphans' court's reasoning. *See*, *e.g.*, N.T., 1/30/24, at 38, 45 (Dr. Bernstein describing the bond between Child and Mother as "insecure," while stating that Child and Maternal Aunt "share an important bond that is long-term in nature"). Thus, the orphans' court did not err or abuse its discretion in finding that Child's needs and welfare are served by termination of Mother's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

7/17/2024